FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JUN 1 4 2012 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

PATRICIA CALLAHAN, Individually and as Proposed
Administrator of the Estate of KEVIN CALLAHAN, and
CHRISTOPHER CALLAHAN, Individually,

**SUMMONS ISSUED**                     Plaintiffs,

-against-

THE COUNTY OF SUFFOLK, POLICE OFFICER
THOMAS WILSON #5675, SERGEANT SCOTT GREENE
#960, POLICE OFFICER ROBERT KIRWAN #2815, POLICE
OFFICER JAMES BOWEN #1294, DETECTIVE SERGEANT
THOMAS M. GRONEMAN, DETECTIVE LIEUTENANT
GERARD PELKOFSKY, DETECTIVE RIVERA,
DETECTIVE O'HARA, JOHN DOE SUFFOLK COUNTY
POLICE OFFICERS # 1-10, RICHARD ROE SUFFOLK
COUNTY EMPLOYEES # 1-10,

                              Defendants.

-----------------------------------------------------------------------X

**CV 12 2973**

**WEXLER, J.**
**COMPLAINT**

**JURY TRIAL**
**DEMANDED**

**BROWN, M. J.**

        The Plaintiffs, complaining of the defendants, by their attorneys, BRUCE BARKET,

ESQ. and AMY MARION, ESQ., respectfully shows to this Court and alleges that they were

deprived their civil rights and sustained injury and death as a result of the deprivations of their

civil rights.

## INTRODUCTION

        1.      On September 20 of 2011, Christopher Callahan called 911 requesting assistance

for his brother Kevin Callahan; informing the 911 operator that he was not sure if his brother

actually was in need of assistance or if he was just saying that he was in need of assistance.

Christopher had explained that his brother had feigned criminal activity in the past and he did not

want the police to think that this was actually a real threat.  However, just to make sure that

everything was okay, he asked if a sector car could go by the house just to check.  The police

arrived at the home, entered, proceeded down the stairs to a back bedroom and then shot Kevin Callahan three times, one shot to his back. Kevin Callahan was unarmed and was cowering in the corner of a back bedroom.

2.  Kevin was handcuffed while he lay motionless and bleeding. The officers, who were not injured, were taken to the hospital for treatment while Kevin Callahan remained untreated, handcuffed, and was left to bleed to death in a bedroom in the back of the house where he was shot.

3.  While Kevin was dying and/or already dead, detectives Rivera and O'Hara unlawfully detained and confined Patricia and Christopher Callahan, required them to give statements about Kevin's history of drug abuse and criminal history, all along lying to them and telling them that Kevin was alive and was fine.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

5.  Supplemental jurisdiction over Plaintiffs' state law claims exists pursuant to 28 U.S.C. 1367(a).

6.  Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b), because that is the judicial district in which the claims arose, and in which the defendants resided or conducted business.

7.  Plaintiffs have complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the County Attorney of the County of Suffolk within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of that notice.

2

8.     At the request of the County of Suffolk, on June 8, 2012, Plaintiffs submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

### JURY DEMAND

9.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiffs request a jury trial on all issues and claims set forth in this Complaint.

### PARTIES

10.     Plaintiff, Patricia Callahan is a resident of Suffolk County in the State of New York and her son, Kevin Callahan was a resident of the County of Suffolk before his death.

11.     Plaintiff, Christopher Callahan is a resident of Nassau County in the State of New York.

12.     Defendant THOMAS WILSON #5675, was employed by the Suffolk County Police Department in 2011. At all times relevant to this complaint, he was a duly appointed and acting police officer of the Suffolk County Police Department with the rank of patrol officer, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

13.     SERGEANT SCOTT GREENE #960 was employed by the Suffolk County Police Department in 2011. At all times relevant to this complaint, he was a duly appointed and acting police officer of the Suffolk County Police Department with the rank of Sergeant, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

3

14.     Defendant POLICE OFFICER ROBERT KIRWAN #2815, was employed by the Suffolk County Police Department in 2011. At all times relevant to this complaint, he was a duly appointed and acting police officer of the Suffolk County Police Department with the rank of patrol officer, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

15.     Defendant POLICE OFFICER JAMES BOWEN #1294, was employed by the Suffolk County Police Department in 2011. At all times relevant to this complaint, he was a duly appointed and acting police officer of the Suffolk County Police Department with the rank of patrol officer, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

16.     Defendant DETECTIVE SERGEANT THOMAS M. GRONEMAN was employed by the Suffolk County Police Department in 2011. At all times relevant to this complaint, he was a duly appointed and acting officer of the Suffolk County Police Department with the rank of detective sergeant, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

17.     Defendant DETECTIVE LIEUTENANT GERARD PELKOFSKY was employed by the Suffolk County Police Department in 2011. At all times relevant to this complaint, he was a duly appointed and acting officer of the Suffolk County Police Department with the rank of detective lieutenant, acting under color of state law, within the scope of his employment, and

in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

18.     Defendant DETECTIVE RIVERA, was employed by the Suffolk County Police Department in 2011. At all times relevant to this complaint, he was a duly appointed and acting officer of the Suffolk County Police Department with the rank of detective, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

19.     Defendant DETECTIVE O'HARA, was employed by the Suffolk County Police Department in 2011. At all times relevant to this complaint, he was a duly appointed and acting officer of the Suffolk County Police Department with the rank of detective, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

20.     Defendants John Doe, whose identities are currently unknown, represent those employees of the Suffolk County Police Department and the Suffolk County District Attorney's Office, acting in their individual capacities, within the scope of their employment, and under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York, who arrived at the scene or supervised the officers on the scene who shot Kevin Callahan, denied him medical attention and/or conducted the investigation that lead to the determination that Mr. Callahan's shooting was justified and/or withheld the information about the shooting and death from Patricia and Christopher Callahan and/or unlawfully detained and imprisoned Patricia and Christopher Callahan.

21.     Defendants Richard Roe, whose identities are currently unknown, represent those employees of the Suffolk County Police Department and the Suffolk County District Attorney's Office, acting in their individual capacities, within the scope of their employment, and under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York, who were both personally involved and who supervised Officers Wilson, Officer Bowen, Officer Kirwan, Detective Rivera, Detective O'Hara and John Doe police officers and investigators who arrived at the scene, supervised the officers on the scene who shot Kevin Callahan, denied him medical attention and/or conducted the investigation that lead to the determination that Mr. Callahan's shooting was justified, and/or withheld the information about the shooting and death from Patricia and Christopher Callahan and/or unlawfully detained and imprisoned Patricia and Christopher Callahan.

22.     Defendant County of Suffolk is a body politic and corporate empowered to exercise home rule.  The Suffolk County Legislature, the County's policymaker, has delegated final policymaking authority for the supervision and control of Suffolk County Police to the duly appointed Commissioner of the Suffolk County Police Department, currently Commissioner Edward Webber.

### FACTS

23.     On September 19, 2011, Patricia Callahan left her home to go and spend the night at a hotel because she did not want to have to deal with her son Kevin Callahan who was just released from Stony Brook Hospital for drug use but who still appeared to be under the influence of drugs.

24.     Kevin had a history of drug use.

25.     The next day, Kevin called his mother Patricia Callahan who could hear that Kevin was not alone in the house.

26.     She heard another voice stating "I'm going to fuck you up" and then she heard Kevin state, "Mom, he's got a gun."

27.     Ms. Callahan was nervous, she summoned her other son, Christopher, and asked him to call 911.

28.     Christopher called 911 and specifically explained that he did not think that there was a real emergency and a real threat, explaining that his brother had lied in such situations in the past.

29.     To be on the safe side, he asked that a police car drive by the house just to check that everything was okay.

30.     When the police arrived, the front door was closed and no one answered the door.

31.     There was no noise coming from the house, no signs of an emergency, no signs of threats, and no indicia of criminal activity.

32.     The police opened the front door and entered the house without having any basis to enter.

33.     Defendant Wilson gave a statement to Defendant Groneman wherein he admitted that no one answered the front door.

34.     Defendant Wilson indicated that he decided the house needed to be checked immediately because he was concerned about the safety of the mother.

35.     Christopher Callahan was with his mother at the hotel when he called 911; he did not indicate that his mother was at the house nor did he indicate that his mother was in danger.

36.     Defendant Wilson did not radio the precinct nor did he ask for clarification of the 911 call; instead, he entered the home.

37.     Defendant Wilson gave a statement indicating that he walked down stairs with a flashlight in one hand and his gun drawn in his other hand; he approached a back bedroom of the lower level of the house where the door was slightly opened, just a crack.

38.     Defendant Wilson stated that he heard movement, noise and objects moving from behind the door.

39.     He stated that when he went to enter the room, the door closed on him, pinning him between the door and the doorjamb and causing him to drop his flashlight.

40.     Defendant Wilson claimed that because he was pinned he could not move his head and he could not see into the room.

41.     Unable to see into the room, he fired his weapon.

42.     An examination of the bedroom door revealed that two shots were fired through that door.

43.     Kevin Callahan was shot three times, one time in the back.

44.     The Medical Examiner's Report indicated that the entrance wound of one of the bullets was seven and one half (7 ½) inches to the right of the posterior midline.

45.     Kevin Callahan was not armed and Officer Wilson did not allege in his statement that Kevin Callahan presented any kind of a threat.

46.     In fact, Kevin Callahan was found to be cowering in the corner of the room.

47.     Sergeant Groneman stated in the Death Report that the decedent engaged in a confrontation with one officer who shot the decedent causing his death.

48.     Officer Wilson never indicated in his statement that Kevin Callahan engaged in a confrontation.

49.     In fact, Officer Wilson stated that the subject was behind the door and, when Officer Wilson started to enter the room to approach the individual, the door closed on him.

50.     Officer Wilson stated that he shot his weapon because he feared that his weapon was in danger of being taken away from him, he never gave any indication that there was any kind of a confrontation as Sergeant Groneman indicated in the Death Report.

51.     Immediately upon being shot, Kevin Callahan was handcuffed.

52.     The officers on the scene were taken to the hospital for treatment while Kevin Callahan was left to bleed to death in the back bedroom, still handcuffed.

53.     Kevin Callahan was not given medical attention.

54.     Patricia Callahan and Christopher Callahan arrived at the location and attempted to get to Patricia Callahan's home but could not gain entry on to the street since it was blocked off.

55.     They asked the officer who was located at the end of the street if they could enter, explaining that it was their home where the police were located.

56.     They were still prevented from gaining entry.

57.     Detective O'Hara and Detective Rivera came to the scene and took Patricia Callahan in their vehicle, held her there for approximately thirty (30) minutes, told her that her son was still alive and everything was fine, and then convinced her to sign a consent form to search her house.

58.     The detectives then told both Patricia and Christopher Callahan that they had to go down to the precinct and give statements.

59.     While their son and brother lay dying in the home, without getting any medical care, the detectives told Patricia and Christopher that Kevin was alive and was fine and that they must come down to the precinct.

60.     Upon arriving at the precinct, Patricia and Christopher were separated, were again and consistently told that Kevin was alive and was fine and that they both had to give statements before they were permitted to leave the precinct.

61.     Both Patricia and Christopher were interrogated and required to give statements about Kevin's criminal history, history of drug abuse and physical encounters with his mother.

62.     The detectives elicited written statements from Patricia and Christopher Callahan.

63.     Only after they educed these statements did they inform Christopher Callahan that his brother had been killed.

64.     They then told Christopher Callahan that he had to inform his mother.

65.     They escorted Christopher into the interrogation room where his mother had been held and stood there while Christopher informed his mother that her son was dead.

66.     No one from Suffolk County ever informed the Plaintiffs how Kevin was killed, no one ever called to offer condolences.

67.     When Christopher asked the Detective how his brother died, the Detective smugly responded that there can only be three ways; stating suicide, homicide and then looking at Christopher and asking, "what's the third way?"

68.     This is how Christopher was informed of his brother's death.

69.     As a result of the unlawful killing by Defendant Wilson, the false claims made against Plaintiff's decedent, the unlawful and egregious detention of the Plaintiffs, the failure to provide medical attention, the failure to properly administrate, investigate and

discipline said defendant officers, all of which constituted extreme and outrageous behavior, Kevin Callahan suffered a horrible and painful death, Patricia and Christopher Callahan suffered from an unlawful and egregious detention and suffer, and, continue to suffer extreme physical and emotional harm, loss of support, loss of love and loss of affection.

### Suffolk County's Custom, Policy and Practice of Unconstitutional Conduct

70.    The unconstitutional and tortious acts of the defendant officers were not isolated incidents.

71.    Upon information and belief, there was a custom, policy, pattern and practice in Suffolk County beginning years before this unjustified shooting and continuing throughout this incident, of condoning, encouraging, ratifying and acquiescing in the practice of the use of excessive force, failing to conduct reasonable criminal investigations, conducting unconstitutional entries into private homes, fabricating evidence supporting probable cause, denying medical attention, and covering up this unconstitutional misconduct.

72.    Upon information and belief, Suffolk County Police policymakers were on notice of, but deliberately indifferent to these unconstitutional customs, policies and practices.

73.    By the time of Kevin Callahan's death, supervisors and Suffolk County Police policymakers were on notice of, and specifically knew, that the Suffolk County Police Department Officers had engaged in unjustified and unlawful shootings, the use of excessive force, the denial of medical attention, fabrication of evidence supporting probable cause and had failed to investigate this finding, and failed to discipline and train its officers.

74.    Upon information and belief, the Suffolk County Police Department, and its policymakers, as well as the individual supervisors in this case, failed to train or supervise investigators to ensure they complied with constitutional requirements in the proper use of force

and the proper use of weapons, in obtaining immediate medical attention for the injured, in obtaining probable cause for entry into private homes and for the detention of individuals.

75.     Upon information and belief, the Suffolk County Police Department, through its final policymakers, failed to adequately screen, supervise, and/or discipline detectives, officers, and investigators.

## DAMAGES

76.     The defendants' unlawful, negligent, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds and omissions caused Plaintiff's decedents death and caused the unlawful detention of Plaintiffs Patricia and Christopher Callahan while their son and brother lay alone, handcuffed and bleeding to his death and caused the negligent and/or intentional infliction of emotional harm.

77.     As a direct and proximate result of the acts of the defendants, the death, injuries and damages sustained by Plaintiff's decedent and Plaintiffs from the deprivation of their civil rights include: violation of clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution; death, personal injuries; pain and suffering; severe mental anguish; emotional distress; extreme fear; denial of medical care; humiliation, indignities, and embarrassment; degradation; egregious injury to reputation; and permanent loss of life, companionship, love and affection.

78.     All the alleged acts, misdeeds and omissions committed by the individual defendants described herein for which liability is claimed were done negligently, intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual defendants meets all of the standards for imposition of punitive damages.

79.     Damages are in the amount to be determined at trial but are in excess of One
Hundred and Fifty Thousand ($150,000.00) Dollars exclusive of interest and costs.

## FEDERAL CLAIMS

## COUNT I

### 42 U.S.C. § 1983 – Excessive Use of Force

80.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the
prior paragraphs with the same force and effect as if more fully and at length set forth herein.

81.     The accusations of wrongful actions against Plaintiff's decedent were false and
an attempt to cover up the killing, which had been inflicted by the Defendants.

82.     The shooting of Plaintiff's decedent by Defendant Wilson constituted unreasonable
and excessive force by a police officer.  Such actions were intentional, negligent, reckless,
careless, unreasonable and unauthorized, as Defendants had a duty to not subject Plaintiff's
decedent to vicious and fatal police actions, but failed to prevent same and breached their duty. This
summary punishment and wrongful seizure was in violation of Plaintiff's decedents rights as
guaranteed under the United States Constitution.

83.     As a consequence of Defendants' wrongful actions, intentional, negligent, and
reckless behavior, and violations of state and federal laws, Plaintiff's decedent was deprived of
his freedom and life forever, was seriously injured, and was subjected to great fear, terror,
personal humiliation and degradation, and suffered great physical pain and impairment, mental and
emotional distress, all as a result of the aforesaid unlawful conduct of Defendants.

84.     That by reason of the foregoing, Plaintiffs suffer and continue to suffer
irreparable injury and monetary damages as set forth above.

## COUNT II

### 42 U.S.C. § 1983 -Denial of Medical Treatment in Violation of the
### Fourteenth Amendment

85.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

86.     Defendants POLICE OFFICER THOMAS WILSON #5675, POLICE OFFICER ROBERT KIRWAN #2815, POLICE OFFICER JAMES BOWEN #1294, SERGEANT SCOTT GREENE #960, DETECTIVE SERGEANT THOMAS M. GRONEMAN, DETECTIVE LIEUTENANT GERARD PELKOFSKY, and other officers who were either at the scene of decedent's death or were giving supervisory direction to individuals at the scene, were deliberately indifferent to Plaintiff's decedent obvious need for medical treatment as he lay bleeding to death.

87.     Defendants knew that Plaintiff's decedent lay bleeding from gunshot wounds and yet they failed to get him medical attention.

88.     In fact, defendant's handcuffed Plaintiff's decedent after he was shot and bleeding from his wounds.

89.     Defendants acted with reckless disregard for the substantial risk posed by Plaintiff's decedent serious medical condition.

90.     Evidencing their reckless disregard is the fact that the defendant THOMAS WILSON #5675 and POLICE OFFICER DANIEL FUREY #5504 and POLICE OFFICER ELISA MCVEIGH #6029 were immediately transported and treated at the hospital even though they did not suffer any injury and Plaintiff's decedent was left to bleed to death while handcuffed and untreated.

14

## COUNT III

### Violation of the Plaintiff's Decedent's Constitutional Rights Pursuant to 42 U.S.C. § 1983 and the Fourth Amendment via an Illegal Entry, Search and Seizure

91.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

92.     That the Plaintiff's decedent's rights have been violated under the Fourth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983, in that the defendants unlawfully entered Plaintiff's decedent residence, illegally and unreasonably detained and seized him, and medical attention was withheld as he lay bleeding to death.

93.     That the said acts, were caused by the defendants, their agents, servants and employees, without any legal justification.

94.     That the defendants confined the Plaintiff's decedent, defendants intended to confine Plaintiff's decedent, Plaintiff's decedent was conscious of his confinement, Plaintiff's decedent did not consent to the confinement and the confinement of Plaintiff's decedent's was not otherwise privileged.

95.     That the said entry, search, seizure and unlawful detention was caused by the defendants, without authority of the law and without any reasonable cause of belief that the Plaintiff's decedent had committed any or were in fact guilty of crimes.

96.     That by reason of the unlawful entry, search, seizure and detention, the Plaintiff's decedent suffered damages as set forth above.

## COUNT IV

**Violation of the Plaintiffs Patricia Callahan and Christopher Callahan's
Constitutional Rights Pursuant to 42 U.S.C. § 1983 and the Fourth Amendment
via an Illegal Search and Seizure**

97.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

98.     That the Plaintiffs' rights have been violated under the Fourth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983, in that Plaintiffs Patricia and Christopher Callahan were illegally and unreasonably detained and seized and forced to return to the police precinct and held until they gave statements regarding the decedent's character, history, and criminal activity for the defendants to use in support of their claim that the shooting of decedent was somehow justified.

99.     That the said acts, were caused by the defendants, DETECTIVE LIEUTENANT GERARD PELKOFSKY, DETECTIVE RIVERA, DETECTIVE O'HARA, their agents, servants and employees, without any legal justification.

100.    That the defendants confined the Plaintiffs, defendants intended to confine Plaintiffs, Plaintiffs were conscious of their confinement, Plaintiffs did not consent to the confinement and the confinement of each of the Plaintiffs was not otherwise privileged.

101.    That the said seizure and unlawful detention was caused by the defendants, without authority of the law and without any reasonable cause of belief that the Plaintiffs had committed any or were in fact guilty of crimes.

102.    That by reason of the unlawful seizure and detention the Plaintiffs suffered damages as set forth above.

16

## COUNT V

### 42 U.S.C. § 1983 *Monell* Claim for Unconstitutional Custom or Policy and Failure to Supervise and Train

103.    Plaintiffs repeat and re-allege each and every allegation contained in the previous paragraphs of this Complaint with the same force and effect as though fully set forth herein.

104.    Prior to September 20, 2011 and since, the County of Suffolk, by and through its final policymakers, had in force and effect a policy, practice or custom of conducting constitutionally inadequate investigations; of failing to obtain probable cause before entry into private homes, of unlawfully detaining individuals, of subjecting individuals to excessive force, deprivation of medical attention, and of creating a paper trail to justify unjustified and illegal shootings.

105.    On May 26, 1994, the New York Times reported that police shot Miguel Rodriguez in the head.  Suffolk County responded by stating that the officer acted within police guidelines and thus would remain on duty.

106.    April 6, 2003, Suffolk County Police Officer Behrle shot Victor Robelio Juarez Perez three times and justified the shooting.

107.    On January 13, 2010, Suffolk County police shot an innocent man and defendant DETECTIVE LIEUTENANT GERARD PELKOFSKY defended the officers and justified their actions and the shooting as documented on ABC's Eyewitness News program on April 22, 2002.

108.    The County of Suffolk has systemically failed adequately to train its police officers, detectives and investigators not to unlawfully detain individuals, failed to train in the proper use of force, the need to provide medical attention, the requirement of probable cause to

enter the homes of private citizens, to ensure that suspects would not be subjected to excessive force, death, and deprivation of medical attention.

109.    The County of Suffolk, by and through its final policymakers, failed to adequately discipline their police officers for failing to obtain probable cause before entering private homes, for unlawfully detaining individuals and for failing to ensure that suspects would not be subjected to excessive force, death, and deprivation of medical attention.

110.    Though it was foreseeable that constitutional violations of the type Plaintiff's decedent suffered would be a predictable result of such failures.

111.    As set forth above, final policymakers for the County of Suffolk had actual or constructive notice of such failures to train, supervise and provide policy to its employees, and failed to provide training or supervision despite an obvious need that such training and supervision was required, where Defendants knew that it was foreseeable that detectives, officers, and investigators would predictably confront these situations and as a result of the failure to train and supervise, constitutional violations would result.

112.    Such failures to train, supervise and discipline, and such unconstitutional municipal customs, practices and/or policies, amounted to deliberate indifference to the constitutional rights of individual suspects like Plaintiff's decedent and were the moving force behind the unjustified entry into his home, unjustified shooting, and the denial of medical attention which could have saved his life, as well as the unlawful detention of his mother and brother and all the ongoing injuries and damages set forth above.

## COUNT VI:

### 42 U.S.C. § 1983 Supervisory Liability

113.    Plaintiffs repeat and re-allege each and every allegation contained in the previous paragraphs of this Complaint with the same force and effect as though fully set forth herein.

114.    DETECTIVE SERGEANT THOMAS M. GRONEMAN, SERGEANT SCOTT GREENE #960, DETECTIVE LIEUTENANT GERARD PELKOFSKY, and John Doe supervisory police officers, acting deliberately, recklessly and under color of law, were, at the relevant times, supervisory personnel with the Suffolk County Police Department with oversight responsibility for training, hiring, screening, instruction, supervision and discipline of POLICE OFFICER THOMAS WILSON #5675, POLICE OFFICER ROBERT KIRWAN #2815, POLICE OFFICER JAMES BOWEN #1294, DETECTIVE RIVERA and DETECTIVE O'HARA and John Doe police officer defendants who deprived Plaintiffs of their clearly established constitutional rights.

115.    DETECTIVE SERGEANT THOMAS M. GRONEMAN, SERGEANT SCOTT GREENE #960, DETECTIVE LIEUTENANT GERARD PELKOFSKY, and John Doe supervisory police officers were personally involved in both the deprivation of Plaintiffs' constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations.

116.    DETECTIVE SERGEANT THOMAS M. GRONEMAN, SERGEANT SCOTT GREENE #960, DETECTIVE LIEUTENANT GERARD PELKOFSKY, and John Doe supervisory police officers were reckless in their failure to supervise defendants POLICE OFFICER THOMAS WILSON #5675, POLICE OFFICER ROBERT KIRWAN #2815,

POLICE OFFICER JAMES BOWEN #1294, DETECTIVE RIVERA, and DETECTIVE O'HARA, and John Doe police officer defendants, and either knew or should have known that defendant officers were using excessive force, entering private homes without probable cause, denying medical attention for gunshot victims, and unlawfully detaining the victims' families or potential witnesses in support of the victim, or that such acts were so egregious that said supervisors should have known that such conduct would occur.

117.     These supervisory defendants knew or in the exercise of due diligence would have known that the conduct of the named and John Doe defendants against Plaintiffs was likely to occur.

118.     The failure of these supervisory defendants to train, supervise and discipline the named individual defendants and John Does amounted to gross negligence, deliberate indifference or intentional misconduct which directly caused the injuries and damages set forth above.

## COUNT VII

### 42 U.S.C. § 1983- Failure to Intervene

119.     Plaintiffs repeat and re-allege each and every allegation contained in the previous paragraphs of this Complaint with the same force and effect as though fully set forth herein.

120.     The Defendants DETECTIVE SERGEANT THOMAS M. GRONEMAN, SERGEANT SCOTT GREENE #960, DETECTIVE LIEUTENANT GERARD PELKOFSKY, POLICE OFFICER THOMAS WILSON #5675, POLICE OFFICER ROBERT KIRWAN #2815, POLICE OFFICER JAMES BOWEN #1294, and John Doe officers and supervisors who arrived at the scene of the shooting, in derogation of their duty, failed to intervene and call for

immediate medical attention for Plaintiff's decedent instead of forcing him to remain handcuffed and slowly bleed to death.

121.    These officers are liable to the Plaintiff's decedent for all direct and proximate results of said acts.

122.    As a direct and proximate result of said acts, Plaintiff's decedent was deprived of his life, was seriously injured, suffered a slow and painful death, and was subjected to great fear, terror, degradation, and mental and emotional distress, all as a result of the aforesaid unlawful conduct of Defendants.

123.    That by reason of the foregoing, Plaintiffs suffered and continue to suffer injury as set forth above and are entitled to monetary damages.

## STATE LAW CLAIMS

## COUNT VIII

### False Imprisonment as to Plaintiff's Decedent

124.    Plaintiffs repeat and re-allege each and every allegation contained in the previous paragraphs of this Complaint with the same force and effect as though fully set forth herein.

125.    Defendants POLICE OFFICER THOMAS WILSON #5675, POLICE OFFICER ROBERT KIRWAN #2815, POLICE OFFICER JAMES BOWEN #1294, and John Doe Officers who arrived on the scene intended to confine Plaintiff's decedent, and, lacking probable cause or any other privilege, curtailed his liberty by shooting him and taking steps to ensure he was detained and confined without legal justification.

126.    Decedent was conscious of the confinement as he lay handcuffed, bleeding and dying, and did not consent to it.

21

127.    As a direct and proximate result of defendants' actions, decedent suffered a slow and painful death and was falsely detained while dying and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT IX

### False Imprisonment as to Plaintiffs Patricia and Christopher Callahan

128.    Plaintiffs repeat and re-allege each and every allegation contained in the previous paragraphs of this Complaint with the same force and effect as though fully set forth herein.

129.    That the Plaintiffs' rights have been violated under the laws and the Constitution of the State of New York in that Plaintiffs Patricia and Christopher Callahan were illegally and unreasonably detained and seized and forced to return to the police precinct and held until they gave statements regarding the decedent's character, history, and criminal activity for the defendants to use in support of their claim that the shooting of decedent was somehow justified.

130.    That the said acts, were caused by the defendants, DETECTIVE LIEUTENANT GERARD PELKOFSKY, DETECTIVE RIVERA, DETECTIVE O'HARA, their agents, servants and employees, without any legal justification.

131.    That the defendants confined each of the Plaintiffs, defendants intended to confine each of the Plaintiffs, each of the Plaintiffs were conscious of their confinement, each of the Plaintiffs did not consent to the confinement and the confinement of each of the Plaintiffs was not otherwise privileged.

132.    That the said seizure and unlawful detention was caused by the defendants, without authority of the law and without any reasonable cause of belief that each of the Plaintiffs had committed any or were in fact guilty of crimes.

22

133.     That by reason of the unlawful seizure and detention the Plaintiffs suffered damages as set forth above.

## COUNT X:

### Intentional or Negligent Infliction of Emotional Distress

134.     Plaintiffs repeat and re-allege each and every allegation contained in the previous paragraphs of this Complaint with the same force and effect as though fully set forth herein.

135.     The deliberate conduct of defendants POLICE OFFICER THOMAS WILSON #5675, POLICE OFFICER ROBERT KIRWAN #2815, POLICE OFFICER JAMES BOWEN #1294, and John Doe Officers who arrived on the scene in shooting Plaintiff's decedent and in denying him medical attention and allowing him to bleed to death, and in detaining Plaintiffs Patricia and Christopher Callahan and forcing them to remain detained until they gave statements about the decedent, while they were horribly concerned and in fear for Kevin's life and while they were continuously inquiring about his well-being, constitutes the intentional infliction of emotional distress.

136.     In the alternative, the conduct of defendants POLICE OFFICER THOMAS WILSON #5675, POLICE OFFICER ROBERT KIRWAN #2815, POLICE OFFICER JAMES BOWEN #1294,and the John Doe Officers who arrived on the scene in denying Plaintiff's decedent medical attention and allowing him to bleed to death, and in detaining Plaintiffs Patricia and Christopher Callahan and forcing them to give statements while they feared for Kevin's life after seeing the police tape around their house, breached a duty of care owed to Plaintiff's decedent as a citizen, and as a crime suspect, which unreasonably endangered his physical safety and caused him to fear for his safety, constituting the negligent infliction of

emotional distress and, breached a duty of care owed to Patricia and Christopher Callahan as citizens and as the victim's family, causing them to trust the word of the detectives and feel secure in their assurances that Kevin was fine after they feared the worst, and then held them and detained them until they elicited statements from them about Kevin, all along while Plaintiffs Patricia and Christopher kept frantically asking about Kevin and kept asking why they weren't getting any information about the police activity at the house, only to eventually be told that Kevin had in fact been killed.

137.    Defendants' conduct caused Plaintiff's decedent to suffer and continues to cause Plaintiffs Patricia and Christopher Callahan to suffer ongoing, unimaginable emotional distress and traumatic psychological sequellae.

## COUNT XI

### Wrongful Death

138.    Plaintiffs repeat and re-allege each and every allegation contained in the previous paragraphs of this Complaint with the same force and effect as though fully set forth herein.

139.    As a result of said actions by Defendants COUNTY, POLICE OFFICER THOMAS WILSON #5675, POLICE OFFICER ROBERT KIRWAN #2815, POLICE OFFICER JAMES BOWEN #1294, and their supervisors, Plaintiff's decedent was caused to die.

140.    That by reason of Plaintiff's decedent's death, Plaintiffs have been deprived of emotional support, companionship, love and affection.

141.    That by reason of the foregoing, Plaintiffs suffer and continue to suffer irreparable injury and monetary damages as set forth.

**WHEREFORE**, Plaintiffs pray as follows:

A.   That the Court award compensatory damages to them and against the defendants, jointly and severally, in an amount to be determined at trial;

B.   That the Court award punitive damages to them, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.   For a trial by jury;

Dated: June 14, 2012
      Garden City, New York

BARKET MARION EPSTEIN & KEARON, LLP

By:   _____
      Amy B. Marion, Esq.
      Bruce A. Barket, Esq.
      666 Old County Road-Suite 700
      Garden City, New York  11530
      (516) 745-0101